UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BAHA TOWNHOUSES, LLP,<br><br>Petitioner,<br><br>vs.<br><br>U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, MARCIA L. FUDGE, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT;<br><br>Respondent. | 4:24-CV-04035-ECS<br><br><br>OPINION AND ORDER DENYING PETITION TO REVERSE FINAL AGENCY ACTION |

An administrative law judge ("ALJ") for the United States Department of Housing and Urban Development ("HUD") found that Baha Townhouses, LLP ("Baha") owed $57,164 to HUD for having collected rental assistance payments for an ineligible tenant. Baha appeals from the ALJ's decision under the Administrative Procedure Act ("APA"), arguing that HUD's decision was arbitrary and capricious.

## I.    Legal Background

Through the Section 8 Project-Based Rental Assistance Program ("PBRA"), HUD subsidizes privately owned properties to provide housing to low-income families. 42 U.S.C. § 3531. HUD typically carries out its mandate through third-party contract administrators, who in turn enter Housing Assistance Payments Contracts ("HAP Contract") with private property owners. See 42 U.S.C. § 1437f; Housing Assistance Payments Contract, 24 C.F.R. § 883.602 (2024). Under these HAP Contracts, private property owners agree to lease units to qualifying

1

low-income families at specified rental rates.  See 42 U.S.C. § 1437f; 24 C.F.R. § 883.602

(2024).  The eligible low-income family tenants pay a portion of the rental rate based on their

income.  See 42 U.S.C. §§ 1437f(c)(3), 1437a(a)(1).  HUD then covers the difference between

what the family tenants pay and the HAP Contract's specified rental rate.  See 42 U.S.C.

§§ 1437a(a)(1), 1437f(c)(3).

   "Family," as used in the PBRA, includes single persons living alone.  42 U.S.C.

§ 1437a(b)(3)(A).  But certain single persons are statutorily barred from living in a housing unit

with two or more bedrooms.  Id.  As HUD's regulations explain, "[a] single person who is not an

elderly or displaced person, a person with disabilities, or the remaining member of a resident

family may not be provided a housing unit with two or more bedrooms."  Housing Assistance

Limitation for Single Persons, 24 C.F.R. § 5.655(b)(5) (2024).

## II.     Factual Background

   Baha owns the eponymously named Baha Townhomes, a housing complex in Sioux

Falls, South Dakota.  The complex offers two- and three-bedroom units to low-income families

pursuant to a HAP Contract.  Though owned by Baha, the townhomes are managed by Thies &

Talle Management Inc, a related but separate entity.[1]  The South Dakota Housing Development

Authority ("SDHDA") administers Baha's HAP Contract on HUD's behalf as a third-party

contract administrator.  Docs. 27-2 at 63–97, 27-3 at 1–31.

---

[1] HUD states that "[t]he Baha Townhouses project is owned by Plaintiff Baha Townhouses
L.L.P., and managed by a related entity, Thies & Talle Management Inc. ('Thies and Talle')."
Doc. 22 at 3 n.2.  But the report for both the 2018 and 2022 MORs state that "Baha Townhouses
are owned by Thies & Talle Enterprises and managed by Thies & Talle Property Management."
Doc. 27 at 73; Doc. 27-3 at 36.  Either way, Baha clarifies that "Thies & Talle need not be
distinguished from Baha, [sic] because Thies & Talle Management, Inc. owns the project,
manages the project, and has borne the brunt of this litigation."  Doc. 25 at 2.

On March 26, 2018, Velder Williams applied for a two-bedroom unit at Baha Townhomes. Doc. 27 at 11–15. Williams's application conveyed that his two children would be living with him on a full-time basis while he received housing assistance.[2] Doc. 27 at 11. Yet his application did not provide social security numbers for either of his children, which were necessary to verify Williams's eligibility to receive rental assistance for a two-bedroom unit. See id. at 5 (social security numbers are required for all household members).[3] Williams explained that he did not have his kids' social security cards; his ex-wife did, with whom he was in a custody dispute. Id. In lieu of the social security cards, Williams shared with Baha a letter he had sent to the state circuit court judge presiding over the custody proceedings. Id. at 16–17. He also applied for help from East River Legal Services to get copies of his kids' social security cards. Id. at 5, 18–20.

Despite this issue, Baha's property manager approved Williams for a two-bedroom unit on April 4, 2018. Id. at 5. The property manager justified forgoing the certification requirement because Baha's staff "was trying to assist [him] by giving him permanent housing which in theory should have helped his case to get custody of his children." Id.; Doc. 27-1 at 2. In June 2018, a new property manager sent Williams a letter reminding him that he still needed to provide social security numbers for his kids. Doc. 27 at 21. The letter also requested an update on the progress of his custody proceedings. Id. at 5, 21. Nothing in the record suggests that Williams responded to the property manager's inquiry or that management continued to follow up. In the end, Williams never received custody of his children, and there is no evidence in the

---

[2] Nothing in the record suggests that his kids were with him when he applied, and Baha later acknowledges that "Williams did not actually have custody of the children listed on his application at the time he moved in." Doc. 27 at 6.

[3] While not flagged as an issue by either party, noticeably absent from Williams's certificate questionnaire is his own social security number. Doc. 27 at 11.

record to show that either of his children ever resided with him at his townhome. Still, Baha received rental subsidies from HUD on Williams's behalf for nearly five years, even though his status as a single person disqualified him from receiving rental assistance for a two-bedroom unit. See id. at 5–10.

Williams's ineligible living arrangement was discovered during a Management and Occupancy Review ("MOR"). Id. at 67–73. Third-party contract administrators like SDHDA must conduct periodic reviews of a property owner's performance, management, and compliance with the HAP Contract. See Management and Occupancy Reviews, 24 C.F.R. § 880.612 (2024); see also Streamlining Management and Occupancy Reviews for Section 8 Housing Assistance Programs, 87 Fed. Reg. 37, 990 (June 27, 2022). MORs are not audits of all tenant files at a property; it instead involves a mere sampling of tenant files.[4] For example, in the 2022 MOR, the SDHDA reviewed three tenant files, Doc. 27 at 67–73, while in 2018 it reviewed four, Doc. 27-3 at 33–41. Because MORs only review samples rather than all units or tenant files, the 2018, 2019, 2020, and 2021 MORs did not catch Williams's ineligibility.

SDHDA conducted a MOR at Baha on October 27, 2022. Doc. 27 at 67–73. Only then did it discover that for the last four years Baha had permitted Williams to live in a unit he was ineligible for. Doc. 27 at 69. As a corrective action, the SDHDA directed Baha to terminate Williams's subsidy and reimburse HUD the full amount of rental assistance it had paid on Williams's behalf. Id. Baha notified Williams on January 25, 2023, that his HUD rental assistance would end on February 28, 2023. Id. at 22. Beginning March 1, 2023, Williams's

---

[4] HUD, Streamlining Management and Occupancy Reviews for Section 8 Housing Assistance Programs and Amending Vacancy Payments for Section 8 and Section 162 Housing Assistance Payments (Jan. 14, 2015), https://www.federalregister.gov/documents/2015/01/14/2015-00357/streamlining-management-and-occupancy-reviews-for-section-8-housing-assistance-programs-and-amending.

share of the rent increased from $0 to $965.  Id. at 7.  Williams did not make his March rent payment.  Id. at 23.  So Baha served Williams with a Proposed Notice of Termination of Lease.  Id.  After Williams also failed to pay his April rent, Baha served him with a Three Day Notice to Quit and Vacate.  Id. at 31–32.  Soon after, Cornerstone Rescue Mission, a program that helps veterans avoid homelessness, stepped in to assist Williams.  Id. at 33.  As a United States military veteran, Williams "was eligible for a Veterans Affairs Supportive Housing voucher from HUD and Cornerstone Rescue Mission."  Doc. 21 at 5–6; Doc. 27 at 33, 35.  Cornerstone paid Williams's rent for March and April, as well as his penalty and late fees.  Doc. 27 at 33.  On May 15, 2023, Williams moved out of his Baha unit and into a less expensive housing project, id. at 7, thus ending Williams's role in the controversy.  But Baha and HUD's saga continues.

On June 16, 2023, HUD sent Baha a "Notice of Funds Owed," which explained its intent to collect $58,204—the total rental assistance HUD paid to Baha on Williams's behalf.  Doc. 27-1 at 5.  Baha appealed to HUD's Office of Hearings and Appeals, Doc. 27 at 5, 46–49, arguing that Williams's occupancy of an ineligible unit should be excused because eviction moratoriums were in effect during a portion of his occupancy, and HUD had granted occupancy waivers in the past, id. at 6–10.  HUD responded to Baha's arguments, explaining why the debt is both legal and collectable.  Id. at 51–63.  Its response also identified an error in its initial debt calculation, thereby reducing the amount sought to $57,164.[5]  Id. at 56, 62.

---

[5] This error was contained in Attachment A to the Notice of Funds Owed to HUD, Doc. 27-1 at 11.  Attachment A is a chart HUD used in calculating the initial debt amount.  See id.; Doc. 27 at 55.  Baha alleges the chart contains additional errors that "need to be corrected."  Doc. 21 at 20.  But Baha does not claim that HUD used Attachment A in its revised calculation or, if they did, that HUD's revised calculation is incorrect.  Nor did Baha raise this issue before the ALJ.  As such, this Court declines Baha's invitation to "correct" record material.

5

On October 27, 2023, the ALJ determined that Baha owed HUD the $57,164 and authorized HUD to seek collection of the debt. Doc. 27-3 at 42–45. Baha moved for reconsideration of the Decision and Order, id. at 48, which HUD opposed, id. at 79. On November 30, 2023, the ALJ denied Baha's motion for reconsideration and reiterated that its Decision and Order "remain[ed] in effect and constitute[d] the final agency decision with respect to the past due status and enforceability of the debt." Id. at 91.

HUD later issued a Notice of Debt to Baha, which called for repayment of the debt in compliance with the ALJ's decision. Id. at 95–97. After Baha failed to pay, HUD referred the debt to the United States Department of the Treasury for collection by administrative offset. Doc. 22 at 6. Once Baha received the Treasury's collection notice, it brought this case under the APA to contest the ALJ's decision. Id.; see also Doc. 1–5.

## III.    Standard of Review

The Administrative Procedure Act ("APA") governs judicial review of a final agency action.[6] A person who has suffered a "legal wrong because of [an] agency action" or is otherwise "adversely affected or aggrieved by [an] agency action . . . is entitled to judicial review" of that action. 5 U.S.C. § 702; see also 5 U.S.C. § 704 (authorizing judicial review of "final agency action[s] for which there is no other adequate remedy in a court"). The APA directs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions" if they are "found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (D) without observance of procedure required by law; (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or

---

[6] Neither party disputes that the ALJ's Decision and Order, as well as its denial of Baha's motion for reconsideration constitute HUD's final agency action. See Doc. 25 at 4.

otherwise reviewed on the record of an agency hearing provided by statute; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2); see also Iowa League of Cities v. EPA, 711 F.3d 844, 855 (8th Cir. 2013) (stating that the APA "empowers federal courts to 'hold unlawful and set aside agency action, findings, and conclusions' if they fail to conform with any of six specified standards" (quoting Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 375 (1989)). "In making the foregoing determinations, the court shall review the whole record" and "decide all relevant questions of law." 5 U.S.C. § 706.

"Judicial Review under [the APA's arbitrary-and-capricious] standard is deferential and a court may not substitute its own policy judgment for that of the agency." FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). If the "agency action [is] reasonable and reasonably explained," its decision will be upheld. Id. Put differently, reviewing courts "simply ensure that the agency acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." Id. (collecting cases). An agency action is arbitrary and capricious when:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Firearms Regul. Accountability Coal., Inc. v. Garland, 112 F.4th 507, 519 (8th Cir. 2024) (quoting McClung v. Paul, 788 F.3d 822, 828 (8th Cir. 2015)). Under this standard, a court should uphold an agency decision "if the agency's path may reasonably be discerned," even when the decision is one "of less than ideal clarity." FCC v. Fox Television Stations, Inc., 556

7

U.S. 502, 513–14 (2009) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419

U.S. 281, 286 (1974)).

      The substantial-evidence standard applies when an agency action is "reviewed on the

record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). "The phrase

'substantial evidence' is a 'term of art' used throughout administrative law to describe how

courts are to review agency factfinding." Biestek v. Berryhill, 587 U.S. 97, 102 (2019) (quoting

T-Mobile S., LLC v. Roswell, 574 U.S. 293, 301 (2015)). "Under the substantial-evidence

standard, a court looks to an existing administrative record and asks whether it contains

'sufficien[t] evidence' to support the agency's factual determinations." Id. (alteration in original)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The threshold for substantial

evidence is not high; it means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." Id. at 103 (quoting Consol. Edison, 305 U.S. at 229); see also

Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951); Wal-Mart Stores, Inc. v. NLRB,

400 F.3d 1093, 1097 (8th Cir. 2005). To overturn an administrative finding for a lack of

substantial evidence, the reviewing court must determine that no reasonable mind could accept

the relevant evidence as adequate to support the agency's decision. See Shipley v. Ark. Blue

Cross & Blue Shield, 333 F.3d 898, 901 (8th Cir. 2003); see also Menendez-Donis v. Ashcroft,

360 F.3d 915, 918 (8th Cir. 2004) (describing the threshold to reverse as "not only that a

persuasive case has been made for the opposite position, but that any reasonable fact-finder

would be persuaded by it").

## IV.    Discussion

### A.  Whether HUD's Decision was Arbitrary and Capricious

Baha argues that HUD's debt determination was arbitrary and capricious for three reasons: (1) "HUD acted negligently and/or with a complete lack of diligence in failing to properly examine" Mr. Williams's housing; (2) HUD did not consider the eviction moratoriums that were in effect for a portion of Williams's tenancy at Baha; and (3) HUD had granted occupancy waivers to single person tenants before.

### 1.  Proper Examinations

Baha begins by shifting blame to SDHDA—whom Baha argues, as the HAP Contract administrator, should have caught Williams's ineligibility earlier than the 2022 MOR.  But Baha's argument fails for several reasons.  First, Baha raises this argument for the first time on appeal.  Yet, as a general rule, reviewing courts do not entertain arguments not presented to the administrative agency.  See Sims v. Apfel, 530 U.S. 103, 109 (2000).  And Baha has presented no circumstances that would warrant abandoning that principle here.  Therefore, Baha's first argument is not properly before this Court.

Even if Baha had properly raised this argument, it lacks merit.  Baha contends that SDHDA had a contractual duty to ensure that only eligible tenants occupied its townhouses.  Baha points to two contractual provisions to support this argument.  Doc. 21 at 10.  The first provision addresses SDHDA's responsibility to conduct annual inspections:

> [SDHDA] shall inspect or cause to be inspected the Contract Units and related facilities at least annually and at such other times (including prior to initial occupancy and rerenting of any unit) as may be necessary to assure that [Baha] is meeting its obligation to maintain the units in Decent, Safe, and Sanitary condition including the provision of the agreed-upon utilities and other services.  [SDHDA] shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

9

Doc. 27-2 at 91. This provision, however, aims to ensure compliance with health, safety, and sanitary standards—not ensuring tenants' eligibility. Nor does this provision set the standard for SDHDA's annual MORs. See 24 C.F.R. § 880.612 (2024).

The second provision Baha cites gets closer, at least now relating to unit populations. That provision states, "Where [SDHDA] determines a unit is larger or smaller than appropriate for an eligible family, [Baha] agrees to correct the situation in accordance with HUD regulations and requirements in effect at the time of the determination." Doc. 27-2 at 92. Baha cites this provision as evidence that SDHDA had a contractual duty to ensure tenants were not occupying a unit larger than what their eligibility allowed. See Doc. 21 at 11. But Baha stretches the text too far. While the text admittedly contemplates SDHDA conducting reviews, nothing in the provision suggests that SDHDA need to conduct reviews in addition to or under stricter standards than the preexisting MORs. This provision imposes no affirmative obligation on SDHDA; it speaks solely to Baha's agreement to correct occupancy errors in compliance with HUD's regulations.

Second, even assuming this provision obligates SDHDA to annually review the eligibility of every tenant, in every unit, for every HAP Contract it administers for HUD, the provision still does not absolve Baha's own neglect in leasing a unit to an ineligible tenant for nearly five years. What Baha's argument ignores is that it too had obligations—and stout ones at that. While SDHDA must perform yearly MORs, Baha must reexamine every tenant's income and familial composition annually. See Section 8 Project-Based Assistance Programs: Reexamination of Family Income and Composition, 24 C.F.R. § 5.657(b) (2024) ("The owner must conduct a reexamination and redetermination of family income and composition at least annually."). Baha

10

acknowledged as much in its July 14, 2023 letter to the Office of Hearings and Appeals, where it advocated for an alternative method of calculating the debt:

> When we met with Tasha Jones from SDHDA to discuss this issue, she told us that the property would only be required to reimburse HUD for the subsidy that was paid after [Williams's] first annual recertification was completed in April of 2019. Her logic behind this plan was that the management company should have discovered that [Williams] was a single adult living in a two-bedroom unit at the time that the first annual rectification was being completed . . . .

Doc. 27 at 6.

Baha, however, now reverses its understanding of the July letter to claim that it is only liable for Williams's first year of rental assistance. Doc. 21 at 11. Relying on a January 20, 2023 email from Kris Gilkerson, a housing management officer at SDHDA, Baha contends that "[a]t most, Plaintiff would be liable to HUD until the first review of Mr. Williams'[s] tenancy was conducted," because at that time "SDHDA, as HUD's agent, failed to complete a proper review of Mr. Williams['s] occupancy." Id. But Baha misreads Gilkerson's email: Baha "[m]anagement should have followed up on this issue. At the latest, it should have been caught at [Williams's] first recertification and, [sic] his ineligibility should have been further addressed at that time." Doc. 27 at 78. Gilkerson's email illuminates what matters most: Baha's independent, repeated failure to reexamine Williams's tenancy and to stop accepting rental assistance for an ineligible tenant.

Third, when Baha contracted with HUD and waded into the Section 8 Housing Assistance Payments Program, it assumed a weighty responsibility:

> Protection of the public fisc requires that those who seek public funds act with scrupulous regard for requirements of law; [Baha] could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.

Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 63 (1984). Given these "demanding standards" Baha's repeated faults thwart its attempt to pass the buck to HUD. As a result, the administrative law judge's decision finding the debt lawful and eligible for collection is not arbitrary and capricious.

## 2. Eviction Moratoriums

Baha argues that eviction moratoriums enacted in response to the Covid-19 pandemic prevented it from resolving William's ineligibility issue. Doc. 21 at 13. Baha asserted this argument before the ALJ three times: first, in its request for a hearing; second, in its motion for reconsideration; and third, in its reply to HUD's response in opposition to its motion for reconsideration. See Doc. 27 at 6; Doc. 27-3 at 50; Doc. 27-3 at 89. The ALJ both considered and rejected this argument:

> [Baha] also points to federal eviction moratoriums under the Coronavirus Aid, Relief, and Economic Security Act (Public Law No. 116-136, § 4024) and 42 U.S.C. § 264 from March 27, 2020, thru July 24, 2020, and September 4, 2020, thru June 30, 2021, respectively, as justification [for] Mr. Williams'[s] continued occupancy of the two-bedroom unit. Here, [Baha] wrongly conflates terminating Mr. Williams'[s] subsidy with eviction.

Doc. 27-3 at 44 n.2. Baha once again raises the eviction moratorium argument, contending that "[t]he agency is not being reasonable and has 'entirely failed to consider an important aspect of the problem, and [its action] is therefore arbitrary and capricious.'" Doc. 21 at 17. At base, Baha argues that HUD's debt calculation should exclude months the eviction moratoriums were in effect because Baha was prohibited from evicting Williams for nonpayment of rent during those months. This argument has two glaring holes.

First, Baha approved Williams for a two-bedroom apartment in April 2018—23 months before the first eviction moratorium took effect. Doc. 27 at 5. Williams's first recertification should have occurred in April 2019—still an entire year before the first eviction moratorium.

12

See id. at 6 (referencing discussion with SDHDA).  Had Baha complied with federal law and HUD's regulations, it never would have let Williams move into a unit he was not eligible for. Baha even conceded this point: "we agree that the decision to allow Mr. Williams to move in before the issue of him obtaining social security cards for his children and resolving custody issues for his children was incorrect." Doc. 27-1 at 2.  And, even then, had Baha diligently followed up on the progress of Williams's custody proceedings and competently conducted its annual recertifications, it would have caught and amended its error well before the eviction moratoriums took effect.

Second, the record contains no evidence that Baha had any plans to address Williams's ineligibility until after SDHDA caught the issue during its October 2022 MOR—14 months after the last eviction moratorium had ended.  Had the eviction moratoriums obstructed Baha from terminating Williams's rental assistance, by the moratoriums' end, Baha would have begun to take corrective action.  Instead, Baha waited 14 months after the last moratorium was lifted—and after HUD stopped paying Williams's rent—before it terminated his lease.

On appeal, Baha challenges the ALJ's differentiation between terminating rental assistance and eviction proceedings.  Doc. 21 at 15.  But the ALJ was correct in distinguishing the two.  An eviction action is a state-law proceeding between a landlord and its tenant.  See Fed. Home Loan Mortg. Corp. v. Mitchell, No. 13-2821, 2014 WL 1663421, at *3 (D. Minn. Apr. 25, 2014) (noting "[e]viction actions are fundamentally a matter of state law").  The termination of rental assistance, on the other hand, is the agency ending a tenant's rental subsidies.  Though a low-income tenant may not afford to cover rent without HUD's support, the two terms are not synonymous, and the ALJ was not wrong to note the difference.

13

Also, HUD never instructed Baha to evict Williams. While Baha fairly points out that terminating rental assistance may lead to an eviction for nonpayment of rent, Doc. 21 at 15, HUD had no authority to consider such consequences when it terminated Williams's rental assistance.[7] Section 1437a makes plain that "[i]n no event may any single person under clause (v) or (vi) . . . be provided a housing unit assisted under this chapter of 2 or more bedrooms." 42 U.S.C. § 1437a(b)(3)(A). And Baha does not dispute that Williams is a single person under clause (vi).

Baha also asserts that HUD's decision was arbitrary and capricious because it required Baha to terminate Williams's rental assistance while also discouraging Baha from evicting tenants. Doc. 21 at 15–17. Baha cites HUD's <u>Guidance for HUD Housing Providers and Housing Program Administrators Regarding Fair Housing and Civil Rights Implications of Termination Actions (Including Evictions) Related to the COVID-19 Pandemic</u> to argue that HUD continued encouraging property owners to avoid evicting tenants after the eviction moratoriums had ended. Doc. 21 at 15. Baha's argument, however, misreads HUD's guidance, which was specifically issued to remind "HUD housing Providers and Program Administrators of the application of fair housing and civil rights laws to termination and eviction actions."[8] Doc. 27-3 at 71. While HUD's guidance did encourage housing providers and program

---

[7] The eviction moratoriums Baha cites do not vest HUD with the authority to pay subsidies to ineligible tenants to protect them from being evicted. <u>Cf.</u> <u>Off. of Pers. Mgmt. v. Richmond</u>, 496 U.S. 414, 424 (1990) ("[N]o money can be paid out of the Treasury unless it has been appropriated by an act of Congress." (quoting <u>Cincinnati Soap Co. v. United States</u>, 301 U.S. 308, 321 (1937))). Instead, the moratoriums simply prohibited landlords from evicting certain tenants for nonpayment of rent. <u>See</u> CARES Act, § 4024(b), Pub. L. No. 116-136, 134 Stat. 281 (2020).

[8] Baha's argument also seems inconsistent with its own actions. If it truly believed HUD's guidance statement to instruct property owners "not to be doing any evictions," Doc. 21 at 15, then its actions to terminate Williams's lease six days after he missed his first rent payment are inexplicable.

14

administrators "to make every effort to prevent evictions for non-payment of rent during the COVID-19 pandemic," such as considering alternative rental assistance programs, it did not preclude property owners from initiating eviction proceedings. Id. at 72. For example, HUD suggested that housing providers consider "public housing and housing choice voucher programs" as a viable alternative to "evictions for non-payment of rent." Id. What HUD's guidance did not endorse, however, was that housing providers altogether forego valid evictions when other viable alternatives fail. See Doc. 27-3 at 71–78.

Because HUD had no legal authority to distribute subsidies to a unexempted single person living in a multi-bedroom unit, HUD's decision to terminate Williams's rental assistance was not arbitrary, capricious, or contrary to law. And the ALJ's characterization of Baha's argument as conflating the termination of rental assistance with eviction does not make it so.

### 3. Estoppel

Baha finally asserts that it should not have to reimburse HUD for rental assistance received before March 21, 2022. Doc. 21 at 17. Alternatively, Baha argues it should only have to reimburse HUD for the difference between rental assistance paid for a one-bedroom and two-bedroom unit. Id. at 17, 19. Baha contends the ALJ disregarded its argument that HUD should be estopped from requiring repayment of Williams's rental assistance when its Denver Satellite Office had a practice of granting ineligible single persons occupancy waivers for multi-bedroom units for "properties with sustained vacancy problems and no likelihood of filling vacant units with eligible applicants." Doc. 27 at 39. Both before and during the time Williams resided at Baha Townhomes, HUD's Denver Satellite Office granted occupancy waivers for tenants at properties either owned or managed by Thies & Talle Management Inc. See id. at 43; Doc. 27-3 at 54–55, 69–70.

15

Despite Baha's contentions to the contrary, HUD did consider this argument and explicitly rejected it in its Order Denying Petitioner's Motion for Reconsideration:

> [Baha] argues the debt should not [be] enforced because HUD's regional office had a practice of subsidizing housing organizations when a single person occupied a two-bedroom unit that had been unoccupied for a given time period or longer. As discussed in the Decision, U.S. statutory law permits subsidies for a single person who resides in a two-bedroom unit only when that person meets certain statutory exceptions. See 42 U.S.C. § 1437a(b)(3)(A). In the Decision the Court found no evidence [Baha's] tenant qualified [for] any of the statutory exceptions, and HUD determined the regional office's practice did not comply with § 1437a(b)(3)(A). Additional arguments put forward by [Baha] (e.g. that other federal statutes and guidance prevented [Baha] from stopping the subsidies) also failed to waive § 1437a(b)(3)(A).

Doc. 27-3 at 92.

Furthermore, Baha's estoppel argument lacks merit. "Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." Heckler, 467 U.S. at 59. The elements of equitable estoppel are:

> (1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably relied on the misrepresentation.

Jensen v. SIPCO, Inc., 867 F. Supp. 1384, 1392 (N.D. Iowa 1993) (citing Nat'l Cos. Health Benefit Plan v. St. Joseph's Hosp., 929 F.2d 1558, 1572 (11th Cir.1991)); see also Heckler, 467 U.S. at 59. Yet the Government is "not [to] be estopped on the same terms as any other litigant." Heckler, 467 U.S. at 60. Estoppel does not apply to cases where the Government is seeking the return of improperly dispersed public funds. See Off. of Pers. Mgmt. v. Richmond, 496 U.S. 414, 427 (1990) (stating that "claims for estoppel cannot be entertained where public money is at stake"); Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 3 (1st Cir. 2009) (stating that "under federal precedent, governments in the past have not been subject to estoppel or, merely

recently, have been held not subject to estoppel"). "The whole history and practice with respect to claims against the United States reveals the impossibility of an estoppel claim for money in violation of a statute." Richmond, 496 U.S. at 430. This is because the public's interest in obeying "the rule of law is undermined" "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel." Heckler, 467 U.S. at 60. As "[a]n administrative agency charged with protecting the public interest, [HUD] is not precluded from taking appropriate action nor can the principles of equitable estoppel be applied to deprive the public of a statute's protection because of mistaken action or lack of action on the part of public officials." Pac. Shrimp Co. v. U.S. Dep't of Transp., 375 F. Supp. 1036, 1041–42 (W.D. Wash. 1974) (citing Maxwell Co. v. NLRB, 414 F.2d 477, 479 (6th Cir. 1969)).

Even if estoppel did apply, after a review of all the factors listed above, this Court rejects Baha's equitable estoppel theory. United States v. Schoenborn, 860 F.2d 1448, 1452 (8th Cir. 1988) (noting that "however heavy the burden might be when as estoppel is asserted against the Government, the private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present" (quoting Heckler, 467 U.S. at 61)). First, HUD never misrepresented Williams's eligibility to live in a two-bedroom unit at Baha. Misrepresentation requires Baha to show that HUD "engaged in 'affirmative conduct . . . that was designed to mislead or was unmistakably likely to mislead'" Baha. Redman v. U.S. W. Bus. Res., 153 F.3d 691, 695 (8th Cir. 1998) (alteration in original) (quoting Bell v. Fowler, 99 F.3d 262, 268–69 (8th Cir. 1996)). Baha seems to argue that the Denver Satellite Office's practice of granting occupancy waivers for properties affiliated with Thies & Talle equates to an implicit misrepresentation of Williams's eligibility to live in a multi-bedroom unit. But this cannot be so. Take for example a June 2021 letter HUD sent Thies & Talle granting an occupancy waiver at its

17

Chamberlain River Buttes Apartments: that letter states, "*This waiver is for this applicant only. Future waivers must be requested individually.*" Doc. 27 at 37 (emphasis added). Thus, HUD's waivers for different tenants at different properties were neither "designed to mislead" nor "unmistakably likely to mislead" Baha as to Williams's eligibility to occupy a two-bedroom unit.

Second, the record does not support a finding that Baha relied on HUD's practice of granting waivers when it approved Williams for a two-bedroom unit. "To analyze the nature of a private party's detrimental change in position, [this Court] must identify the manner in which reliance on the Government's misconduct has caused [a plaintiff] to change [its] position for the worse." Heckler, 467 U.S. at 61. As stated above, the Government's past waivers did not constitute a misrepresentation. But even if they had, Baha has not shown that HUD's past practice of granting waivers induced it to accept Williams as a tenant, nor could it. Baha knew these waivers were only granted for "sustained vacancy problems" when there was "no likelihood of filling vacant units with eligible applicants." Doc. 27 at 39 (email from Thies & Talle to HUD reciting the handbook policy for waivers). And Baha never had "sustained vacancy problems" while Williams was a tenant. See Doc. 27-3 at 34–35 (noting that Baha averages "only one or two vacant units per month" but also maintains a double-digit waitlist); Doc. 27 at 71–72 (same). And the occupancy waivers did not broadly apply to management companies or properties; they were limited to specific tenants at specified property locations. See id. at 37. If Baha relied on past waivers to overlook Williams's ineligibility, it did so unreasonably.

Third, even if Baha did rely on HUD's past practice of granting waivers, the consequences of doing so "were not entirely adverse." Heckler, 467 U.S. at 61. For five years, Baha enjoyed the immediate benefit of receiving rent payments it had no entitlement to. Its sole

18

"detriment is the inability to retain money that it should never have received in the first place." Id. "Thus, this is not a case [where Baha] has lost any legal right, either vested or contingent, or suffered any adverse change in its status." Id. at 61–62.

Finally, HUD's occupancy waivers were not legally authorized, and Baha cannot claim an entitlement to a benefit that violates federal law. See Richmond, 496 U.S. at 430 ("[I]t would be most anomalous for a judicial order to require a [g]overnment [agency] . . . to make an extrastatutory payment of federal funds."). As already explained, federal law disqualified Williams from receiving PBRA rental assistance for a two-bedroom unit. Worse still for Baha's situation, "the fact that others might have obtained benefits at a time before [the agency's] interpretation of the pertinent statutes was corrected does not give [Baha] an enforceable right to rely on that erroneous interpretation." Murry v. Nat'l Aeronautics & Space Admin., 387 F. App'x 955, 959 (Fed. Cir. 2010). Thus, Baha was never entitled to the rental assistance payments HUD paid on Williams's behalf.

## B. Substantial Evidence and Trial De Novo

Baha also suggests two other bases for why HUD's decision should be set aside. In the standard of review portion of its opening brief, Baha makes a passing reference to the substantial evidence standard of review in 5 U.S.C. § 706(2)(E). And in its Petition for Review, Baha asserts that HUD's decision was "unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court," Doc. 1 ¶ 47; 5 U.S.C. § 706(2)(F). But Baha's opening brief does not develop any meaningful argument under either theory. Courts deem an argument forfeited when a petitioner references an argument in his or her opening brief but fails to develop that argument. Sensient Techs. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 762 (8th Cir. 2010); Cubillos v. Holder, 565 F.3d 1054, 1058 n.7 (8th Cir. 2009) (deeming an argument

forfeited when petitioner referred to it in his opening brief but did not develop it further). When

a party references an argument without expounding on it further, they are, in essence, inviting the

court to examine the record to find the facts needed to develop the argument on its own. "A

party may not make bare-bones assertions 'hoping [the court] will do its work for it by

developing the argument and putting flesh on its bones.'" Jacam Chem. Co. 2013, LLC v.

Shepard, 101 F.4th 954, 963 (8th Cir. 2024) (quoting Sturgis Motorcycle Rally, Inc. v. Rushmore

Photo & Gifts, Inc., 908 F.3d 313, 324 (8th Cir. 2018)). This Court, therefore, determines that

Baha has waived these arguments and will not consider them.

## V.    Conclusion

For the reasons explained above, it is hereby

ORDERED that Baha's request for "reversal of the Order Denying Reconsideration and the

Decision and Order" or "[i]n the alternative, for reversal of the Order Denying Reconsideration

and the Decision and Order for all subsidies received by Plaintiff after October 3, 2018, and a

remand to HUD to recalculate any reimbursement owed by Plaintiff," Doc. 1 at 10, is denied. It

is further

ORDERED that the ALJ's Decision and Order authorizing the Secretary "to seek collection

of [Baha's] outstanding obligation by means of administrative offset in the amount of

[$57,164.00]," Doc. 27-3 at 45; Doc. 27-3 at 95, is affirmed.

DATED this 20 day of May, 2025.

BY THE COURT:

ERIC C. SCHULTE
UNITED STATES DISTRICT JUDGE

20